**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| ADAM MOHANNA, | : | Case No. 1:10-cv-00776 |
| Plaintiff, | : | Judge Michael R. Barrett |
| - vs - | : | |
| JAKE SWEENEY AUTOMOTIVE, INC., | : | |
| Defendant. | : | |

## ORDER AND OPINION

This matter is before the Court on Defendant Jake Sweeney Automotive, Inc.'s Motion for Summary Judgment ("Motion for Summary Judgment") (Doc. 26)[1] and corresponding Motion for a Hearing on Motion for Summary Judgment (Doc. 32). Plaintiff Adam Mohanna filed a Memorandum in Opposition to the Motion for Summary Judgment (Doc. 35) and Defendant has filed a Reply in Support of the Motion for Summary Judgment (Doc. 39). The Motion for Summary Judgment is now ripe for review.

## I.    BACKGROUND

The facts are construed in favor of Mohanna as follows. Mohanna is a native-born United States citizen of Egyptian descent and an ethnic Arab-American. (Doc. 35, Ex. A ¶ 2). Mohanna wears a beard as part of his religion, he fasts and prays during the month of Ramadan, and he often kept religious artifacts and a prayer rug at his workplace. (Doc. 28, pp. 49, 54-55, 139-40).

For two years, Mohanna worked as a car salesperson for car dealership Kerry

---

[1] All Court document citations are to Docket Entry numbers.

Ford. (Doc. 28, p. 20). Around January 2007, Mohanna was terminated from Kerry Ford. (Doc. 28, p. 20). A few weeks later, Mohanna was hired by Jake Sweeney as a used car salesperson. (Doc. 28, p. 18). The person who hired Mohanna was Sales Manager Tom Wilson. (Doc. 28, pp. 21-22). Mohanna was paid by Jake Sweeney on a commission basis. (Doc. 28, p. 22).

From the beginning of Mohanna's employment at Jake Sweeney, his co-workers made comments to him regarding his race, religion and national origin. On Mohanna's first day of work at Jake Sweeney, his co-worker Tim Spaw referred to Mohanna as "Rashid." (Doc. 28, p. 66). Spaw continued making similar comments to Mohanna throughout his employment at Jake Sweeney, occasionally in the presence of other co-workers and managers. (Doc. 28, pp. 62-65). For example, on a daily basis, Spaw called Mohanna "pipe bomb." (Doc. 28, p. 66; Doc. 35, Ex. B ¶ 11). He also called Mohanna other names such as "Osama." (Doc. 35, Ex. B ¶ 11). Another co-worker, Steve Daggy, told Mohanna that "Arabs shit in the street and wipe their ass with their hands," that he would soon be deployed to Afghanistan to "kill your people," and that "Sunnis and Shi'ites were crazy." (Doc. 28, pp. 62-65). Yet another co-worker, Ryan Thomas, would mock Middle Eastern and East Indian customers when Mohanna was nearby, calling them "dirker dirkers," "jihadis," and "towel heads." (Doc. 28, pp. 140-41). Thomas also called Mohanna a "terrorist" and a "suicide bomber." (Doc. 35, Ex. D ¶ 17). On one occasion, Thomas asked Mohanna why he did not collect his welfare check because "[i]sn't that what you jihadis are doing nowadays anyway?" (Doc. 28, p. 42). Thomas also mocked and ridiculed Mohanna for fasting, and would regularly interrupt his prayer ritual by slamming doors, flipping the light switches, and hiding his

prayer rugs. (Doc. 28, pp. 51-52; Doc. 35, Ex. D ¶ 18). Co-workers of Mohanna observed that Mohanna disliked his co-workers' conduct and tried to brush it off. (Doc. 35, Ex. B ¶¶ 4. 11, Ex. C ¶ 9, Ex. D ¶¶ 16-17). One co-worker saw Mohanna shake his head in disgust at one statement made by Spaw and noticed he was visibly distressed by the name calling. (Doc. 35, Ex. D ¶¶ 16-17).

Managers at Jake Sweeney made similar comments to Mohanna at various times throughout his employment. One manager, Aaron Purdue, called Mohanna a terrorist on several occasions. (Doc. 28, pp. 66-67). Mohanna's Assistant Manager, Herb Stephens regularly called Mohanna names such as "Taliban," "terrorist," "Osama," "suicide bomber," "Bin Laden," and "pipe bomb." (Doc. 35, Ex. B ¶ 12). He also told Mohanna to "go back to your own country," and asked him "what are you going to blow up next?" (Doc. 35, Ex. B ¶ 12, Ex. C ¶ 3). When customers who looked like Middle Easterners came into the showroom, Assistant Manager Stephens would tell Mohanna "there go your cousins." (Doc. 35, Ex. B ¶ 16). He also told Mohanna that he practiced his own religion by "hating" Mohanna. (Doc. 35, Ex. B ¶ 17). Several other comments, such as "Muslims don't wash themselves," "[w]hat terrorist organization are you from?" and "[d]on't pray in front of your stepson; you'll scare him," were made by Assistant Manager Stephens to Mohanna in the presence of Manager Wilson and Manager Zach Sweeney. (Doc. 28, pp. 38-39). Assistant Manager Stephens also participated in taunting Mohanna with food during the Ramadan fasts in 2007 and 2008, and in removing his prayer rugs and otherwise interfering with his prayer rituals. (Doc. 28, pp. 51-52, 139). In addition to the comments by Manager Purdue and Assistant Manager Stephens, Manager Wilson commented on Mohanna's low sales performance and told

Mohanna that General Manager Fred Manegold was "on his ass" about Mohanna because of that his "terrorist look." (Doc. 28, p. 53). Referring to Mohanna's beard, Manager Wilson told Mohanna to "[s]have that thing," and indicated that "[i]t's scaring customers[;] [i]t looks radical[;] [y]ou look like a . . . terrorist," even though other employees of Jake Sweeney were permitted to have facial hair. (Doc. 28, pp. 54, 143-44; Doc. 35, Ex. B ¶ 6, Ex. D ¶ 21). Co-workers observed that Mohanna was upset by the comments. (Doc. 35, Ex. B ¶¶ 15-16, Ex. D. ¶ 21).

In 2007 and 2008, Mohanna requested time off for the Islamic holiday "Eid", but Manager Wilson refused to grant him permission to take that time off. (Doc. 28, p. 80). Mohanna told Manager Wilson that he had someone to cover his hours and he would work an extra day if possible, but Manager Wilson still refused and told Mohanna to focus on selling cars. (Doc. 28, p. 81).

While employed at Jake Sweeney, Mohanna also regularly asked Manager Wilson and Assistant Manager Stephens for time off for Friday prayers, and informed them that he had someone to cover his hours and would work extra if necessary. (Doc. 28, pp. 81-82). Manager Wilson and Assistant Manager Stephens told Mohanna to "kick rocks." (Doc. 28, pp. 81-82). Other employees were permitted time off from work for "whatever reason." (Doc. 28, pp. 134-36).

In or about August 2008, Mohanna was transferred from the sales floor to internet sales. (Doc. 28, pp. 128-29). He was told by Manager Wilson that he was being taken off the floor because of his "appearance" and his "beard," and because him "being basically Arab and Muslim scared customers." (Doc. 28, p. 129). Although Mohanna considered the transfer to be a promotion because he made more money, he

was upset that he got taken off the floor because of his appearance, national origin and religion. (Doc. 28, p. 133). He eventually was transferred back to the sales floor. (Doc. 28, p. 133).

Mohanna complained about the treatment he was receiving. He complained to Manager Wilson on several occasions to no avail. (Doc. 28, pp. 28-30, 41, 58). On one occasion, Manager Wilson pulled Mohanna aside after Mohanna and co-worker Thomas had a verbal disagreement that started to escalate. (Doc. 28, p. 42). At that time, Mohanna complained about the treatment he was receiving and about Manager Wilson's lack of response to his complaints. (Doc. 28, pp. 42-43). In response, Manager Wilson took some limited action, but the relief was short-lived. (Doc. 28, pp. 42-43).

Mohanna also complained to Manager Sweeney. (Doc. 28, pp. 44-45). Mohanna believed that Manager Sweeney had the title of "General Manager" and could provide him with relief from the comments and conduct of his co-workers and managers. (Doc. 28, pp. 44, 57). On one occasion, Manager Sweeney responded to Mohanna's complaint by saying: "Don't pull the race card on me." (Doc. 28, p. 45). He told Mohanna that he had "plenty of Muslim friends" who did not find the comments about which Mohanna complained to be offensive. (Doc. 28, p. 45). Thereafter, offensive comments were made to Mohanna in front of Jake Sweeney over a dozen times. (Doc. 28, p. 46). Sweeney also participated in making comments, calling Mohanna "pipe bomb," "terrorist," "crazy Iraqi," and "crazy Egyptian." (Doc. 28, p. 46). In the winter of 2008-2009, Manager Sweeney refused to allow Mohanna to borrow a 4 x 4 dealer vehicle to get home during a snow storm, even though he allowed other

employees to drive a dealer vehicle that day because Mohanna's "guys don't do nothing but drive cars into buildings and blow them up." (Doc. 28, p. 46).

During Mohanna's employment with Jake Sweeney, he posted low to moderate sales. (Doc. 28, p. 26). In some months, he posted no to little sales and sometimes did not earn enough commissions to cover his draw. (Doc. 28, pp. 113, 117-18, and Ex. 4). Other sales employees prevented him from obtaining sales by sending him customers with bad credit on at least ten occasions so that he had to waste time dealing with customers who could not buy cars. (Doc. 28, pp. 28-29). On six or more occasions, Mohanna's sales were given to another employee without Mohanna's consent. (Doc. 28, pp. 106-09). Further, on dozens of occasions, co-workers interfered with his sales by making customers aware that Mohanna was a Muslim, an Arab and an Egyptian. (Doc. 28, pp. 141-42, 158-59). Mohanna testified that "[j]ust working there, it depressed me a lot, it changed my attitude at home, and it was affecting my income based off my performance." (Doc. 28, p. 27).

In approximately mid to late 2008, Mohanna began searching for a new job due to the discrimination and harassment he was experiencing at Jake Sweeney. (Doc. 28, pp. 11, 27, 86-87). In or about February 2009, Manager Wilson sent Mohanna home from work at Jake Sweeney on two occasions and told him not to come back. (Doc. 28, pp. 86-87). After the second occasion he was sent home, Mohanna did not return to work at Jake Sweeney. (Doc. 28, p. 88). Manager Wilson and Assistant Manager Wilson recall that Mohanna resigned. (Doc. 29, pp. 52-54; Doc. 30, p. 23). Approximately two days after resigning from Jake Sweeney, Mohanna started a new, better paying job as a loan officer at General Revenue Corporation. (Doc. 26, Ex. 3;

Doc. 28, pp. 11-14).

On November 5, 2010, Mohanna filed this lawsuit against Jake Sweeney. (Doc. 1). In his Amended Complaint filed on November 28, 2011, he asserts claims against Jake Sweeney for hostile work environment, disparate treatment, retaliation and denial of religious accommodations under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), *et seq.*, and the Ohio Civil Rights Act, Ohio Rev. Code Ann. § 4112.01, *et seq.* (Doc. 13). On May 14, 2012, Jake Sweeney moved for summary judgment on all of Mohanna's claims. (Doc. 26).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if its resolution affects the outcome of the suit. *Id.*

On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248–49. "The mere existence of a scintilla of evidence in support of the [non-moving

party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252. Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III. <u>ANALYSIS</u>

Mohanna's claims for hostile work environment, disparate treatment, retaliation and denial of religious accommodations are based on the way Jake Sweeney purportedly treated Mohanna on account of his race, religion, and/or national origin. (*Id.*) Under Title VII, it is illegal for employers:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion . . . or nation origin; or

> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion . . . or national origin.

42 U.S.C. § 2000e-2(a). *See also* 42 U.S.C. § 2000e-5(f). Ohio law similarly makes employment discrimination based on race, color, religion or national origin unlawful. Ohio Rev. Code Ann. §§ 4112.02(A), 4112.99. The Ohio Supreme Court has held that federal caselaw interpreting Title VII is equally applicable to discrimination claims brought under Ohio law. *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 631 (6th Cir. 2008) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm.*, 66 Ohio St. 2d 192, 421 N.E.2d 128, 131 (Ohio 1981)). Therefore, the following summary judgment analysis applies to both the Title VII and Ohio claims. *See*

*id.*

## A.     Hostile Work Environment

Mohanna claims that Jake Sweeney violated Title VII and Ohio law by failing to eliminate a hostile work environment.   (Doc. 13, pp. 11-12, 17).   Jake Sweeney acknowledges that genuine issues of fact may exist on the hostile work environment claim and seeks dismissal of that claim only on the ground that Mohanna has failed to prove any damages.  (Doc. 26, pp. 12, 28-35).  For the reasons explained below, the Court finds that Mohanna has failed to raise a genuine issue of material fact as to his damage claim for lost commissions and lost wages, and therefore grants partial summary judgment to Jake Sweeney on that issue.   However, the Court further finds that Mohanna has raised a genuine issue of material fact as to compensatory damages for emotional distress and as to punitive damages and attorneys' fees, and therefore denies summary judgment to Jake Sweeny on the Title VII and Ohio claims for hostile work environment as a whole.

### 1.     Lost Commissions and Lost Wages

Jake Sweeney argues that Mohanna has failed to prove lost commissions and lost wages because he failed to provide a calculation of those damages in compliance with Federal Rule of Civil Procedure 26.  (Doc. 26, pp. 28-35; Doc. 39, pp. 10-12).  Rule 26 requires a party to provide the opposing party with "a computation of each category of damages claimed" as well as "the documents or other evidentiary material . . . on which each computation is based, including materials bearing on the nature and extent of injuries suffered."   Fed. R. Civ. P. 26(a)(1)(A)(iii).   As the rule states, those disclosures are automatic and must be provided without awaiting a discovery request. *Id.*  Under Rule 37, a party who fails to comply with Rule 26(a) or to supplement its

disclosures or other discovery responses in compliance with Rule 26(e) will be prohibited from using that evidence "on a motion, at a hearing, or at trial." Fed. R. Civ. P. 37(c)(1). The "'sanction is mandatory unless there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless.'" *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 370 (6th Cir. 2010) (quoting *Vance ex rel Hammons v. United States*, No. 98-5488, 1999 U.S. App. LEXIS 14943, at *6 (6th Cir. June 25, 1999)). *Accord*: *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) ("Federal Rule of Civil Procedure 37(c)(1) requires absolute compliance with Rule 26(a), that is, it mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified.") (internal quotations omitted).

Here, Mohanna contends that his failure to comply with Rule 26 was substantially justified or harmless. (Doc. 35, pp. 16-17, 31). He contends that his deposition testimony and the production of tax documents from the years 2009 through 2011 provide adequate support for his damage claim for lost commissions and lost wages. (Doc. 35, pp. 16-17, 31). He argues that using that information along with the framework set forth in his interrogatory response, Jake Sweeney could have calculated his lost commissions and lost wages. (Doc. 35, pp. 16-17, 31). He further states that Jake Sweeney was aware "at all times the difficulty Mr. Mohanna faced in calculating his economic damages and precisely figuring his compensatory and punitive damages." (Doc. 35, p. 31).[2]

---

[2] Mohanna also argues that the law is not settled on whether he must state a specific amount of damages during discovery. (Doc. 35, p. 31). However, the argument is directed towards his calculation of emotional distress damages rather than lost commissions or lost wages. (*Id.*) As Jake Sweeney is not alleging that he had to provide a

The Court finds that Mohanna's arguments are without merit. Mohanna made his initial disclosures to Jake Sweeney on or about May 31, 2011. (Doc. 26, Affidavit of Heather Muzumdar ("Muzumdar Aff.") at Ex. 1). In the initial disclosures, he stated that he had "not yet compiled his specific damages at this time, but will address this issue once the Plaintiff is able to conduct further discovery to more accurately assess his damages." (*Id.*) On or about September 21, 2011, Mohanna made a similar representation to Jake Sweeney when responding to Jake Sweeney's first set of interrogatories and document requests. (Doc. 26, Muzumdar Aff. at Ex. 2, pp. 21, 23, 29). When Mohanna supplemented his responses on or about January 17, 2012, he provided little additional information and again stated that he was still assessing his damages. (Doc. 26, Muzumdar Aff. at Ex. 3, p. 19). On February 22, 2012 and March 5, 2012, Jake Sweeney sent letters to Mohanna requesting that he supplement his response to provide a calculation of his damages and the documents upon which such calculation is based. (Doc. 26, Muzumdar Aff. at Ex. 4, pp. 2-3, Ex. 5, pp. 3-4). The March 5, 2012 letter also warned Mohanna that it would seek to exclude that information if he did not supplement his responses. (Doc. 26, Muzumdar Aff. at Ex. 5, pp. 3-4). On or about March 14, 2012, Mohanna provided a supplemental response to Jake Sweeney that stated, in relevant part:

> Compensatory Damages: Plaintiff suffered damages from not being able to earn commission on car sales in the following ways: Plaintiff's commissions were reduced as a result of his sales being giving [sic] away to other sales representatives, without his permission, over a dozen times. Plaintiff's interaction[s] with customers were interfered with which resulted in fewer sales to the Plaintiff. Plaintiff's sales were also affected as he had to deal with customers who had no ability to buy cars and such customers were maliciously and intentionally directed towards the Plaintiff by other

precise calculation for emotional distress damages (Doc. 39, p. 16), the Court need not address that argument in the context of Rule 26.

sales employees. This resulted in Plaintiff wasting time and he was not able to sell cars to customers who were genuine potential buyers. Also due to the discrimination, Plaintiff started suffering from anxiety, depression, and loss of confidence, which also affected his ability to sell cars.

(Doc. 26, Muzumdar Aff. at Ex. 6, pp. 7-8). Thereafter, on April 9, 2012, factual discovery closed in this case. (Doc. 19). On May 14, 2012, Jake Sweeney filed its Motion for Summary Judgment. (Doc. 26). Finally, on May 31, 2012, Mohanna provided Jake Sweeney with a supplemental response that included a calculation of damages based on his average earnings at Kerry Ford minus his yearly earnings between 2007 and 2011. (Doc. 35, Ex. F, pp. 2-3). Considering those facts, the Court finds that Mohanna's failure to comply with Rule 26 is neither substantially justified nor harmless.

At no time until after Jake Sweeney moved for summary judgment did Mohanna provide a formula for calculating Mohanna's lost commissions or lost wages. Although Mohanna claims that his interrogatory response provided a sufficient framework for calculating those damages (Doc. 35, pp. 16-17, 31), that interrogatory response makes no mention of Kerry Ford or his prior compensation, (*see* Doc. 26, Muzumdar Aff. at Ex. 6, p. 7). Indeed, based on that interrogatory response, it appears that he intended to calculate his lost commissions or lost wages based upon the number of lost sales and/or the time wasted with unqualified customers. (Doc. 26, Muzumdar Aff. at Ex. 6, p. 7). Mohanna gave Jake Sweeney no meaningful indication that he would rely on his compensation at Kerry Ford in calculating his lost commissions and lost wages at Jake Sweeney. Jake Sweeney therefore had no reason to assume Mohanna would rely on that information.

Mohanna also failed to provide any meaningful evidence to support a critical

piece of his proposed damage computation – his prior compensation at Kerry Ford. The only evidence that the parties have presented to the Court of Mohanna's prior compensation at Kerry Ford is Mohanna's testimony that: "I believe in my first year I made . . . [b]etween 40[,000] and 50[,000]" dollars, and that in his second year made "maybe 35[,000]" dollars. (Doc. 28, p. 20). Mohanna also briefly testified about his compensation structure at Kerry Ford: "It was a draw plus a commission. . . The draw was every two weeks. And then you got commission in the middle of the month and at the end of the month for your settle up. . . [W]e would have to pay back the draw if you made it past it, and then the rest was yours." (Doc. 28, pp. 19-20). Mohanna, however, did not provide any documents that demonstrated the exact amount of his compensation at Kerry Ford or the bases for that compensation. Nor did Mohanna provide any documents relating generally to the compensation structure at Kerry Ford. That information should have been provided to Jake Sweeney automatically under Rule Rule 26. Fed. R. Civ. P. 26(a)(1)(A)(iii) (a party must make available "the documents or other evidentiary material . . . on which each computation is based, including materials bearing on the nature and extent of injuries suffered"). At a minimum, it should have been provided to Jake Sweeney in response to its multiple requests for a computation of his damages. Mohanna's failure to provide that information to Jake Sweeney until more than a month after the close of discovery, and after Jake Sweeney already had moved for summary judgment, deprived Jake Sweeney of the opportunity to explore the basis of the computation during depositions and discovery. The minimalistic deposition testimony and evidence of compensation from employers other than Kerry Ford are insufficient to remedy the deficiencies in Mohanna's damage computation, and to satisfy

the stringent disclosure requirements of Rule 26.

Moreover, Mohanna has provided the Court with no reasonable justification for his delay in providing Jake Sweeney with the damage computation. Although he claims the damages were difficult to calculate, the information upon which he relies should have been in his possession or reasonably accessible to him at all times during the litigation. He provides no explanation of any specific challenges he faced in obtaining the necessary information or making the computation. Indeed, the late computation that Mohanna provided to Jake Sweeney uses a simple formula to calculate his lost commissions and lost wages. (Doc. 35, Ex. F). It does not appear to require any complex analysis that would justify a twelve-month delay.

Accordingly, the Court concludes that the application of Rule 37 is appropriate, and the evidence as to Mohanna's lost commissions and lost wages is excluded on summary judgment. *Bessemer*, 596 F.3d at 367. Without any evidence as to his computation of lost commissions and lost wages, Mohanna cannot demonstrate a genuine issue of material fact for trial. *See id.*[3] Partial summary judgment is granted in favor of Jake Sweeney on the damage claim for lost commissions and lost wages.

### 2. Emotional distress

Jake Sweeney argues that Mohanna has failed to produce evidence of emotional distress beyond his own self-serving and conclusory testimony. (Doc. 26, pp. 33-34; Doc. 39, pp. 15-16). "Emotional distress damages, as with any other type of personal compensatory damages, must be supported by competent evidence." *Bert v. AK Steel*

---

[3] Notably, if the Court were to exclude only that evidence as to Kerry Ford, Mohanna would not be able to prove lost wages or lost commissions by comparing his salary at Jake Sweeney to his compensation at General Revenue Corporation, as the parties agree that he made as much or more at General Revenue Corporation compared to at Jake Sweeney. (Doc. 26, p. 31; Doc. 28, pp. 12-14; Doc. 35, p. 15).

*Corp.*, No. 1:02cv467, 2008 U.S. Dist. LEXIS 37324, at *13 (S.D. Ohio May 7, 2008). However, it is well-settled that medical support is not required to prove emotional distress. *Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1215 (6th Cir. 1996) (citing *Moody v. Pepsi-Cola Metro. Bottling Co.*, 915 F.2d 201, 210 (6th Cir. 1990); *Williams v. Trans World Airlines, Inc.*, 660 F.2d 1267, 1273 (8th Cir. 1981)). "An injured person's testimony alone may suffice to establish damages for emotional distress provided that [he] reasonably and sufficiently explains the circumstances surrounding the injury and does not rely on mere conclusory statements.'" *Bert*, 2008 U.S. Dist. LEXIS 37324, at *13 (quoting *Bach v. First Union Nat'l Bank*, 149 Fed. App'x 354, 361 (6th Cir. 2005)).

Here, Mohanna has produced sufficient evidence of emotional distress to withstand summary judgment. First, he produced evidence to raise a genuine issue of material fact as to whether he was in a vulnerable state. *Turic*, 85 F.3d at 1215 (recognizing that "[v]ulnerability is relevant in determining damages" for emotional distress, and finding that a pregnant woman could be found to be in a vulnerable state at the time of discrimination). Specifically, Mohanna testified that just weeks prior to being hired as a car salesman by Jake Sweeney, he had been fired from his job as a car salesman at Kerry Ford. (Doc. 28, p. 20). He further testified that he had been subjected to comments from his co-workers since his first day at Jake Sweeney. (Doc. 28, p. 66). Construed in favor of Mohanna, those facts suggest that he could have been easily upset by the statements and conduct of co-workers and managers at Jake Sweeney relating to his religion, race and national origin. *Turic*, 85 F.3d at 1215.

Second, Mohanna testified to manifestations of emotional distress. *Id.* at 1215-16 (recognizing that testimony that the plaintiff was "highly upset" was insufficient

evidence of emotional distress, but concluding that testimony that the plaintiff suffered manifestations of emotional distress such as nightmares, weight loss and excessive nervousness was sufficient evidence to sustain a claim for emotional distress). Specifically, Mohanna testified that: (1) he experienced anxiety; (2) he felt depressed; (3) he lost confidence; (4) his attitude changed at home; (5) he experienced some marital troubles and had to seek counseling while he was working at Jake Sweeney; and (6) he got into an intense verbal disagreement with one of his coworkers about comments made towards Mohanna, which required the intervention of Manager Wilson. (Doc. 28, pp. 27, 39, 42, 45-46, 141-42, 158-59). He also testified that many of the intolerant comments and acts directed towards him were made in the presence of other coworkers and his customers (Doc. 38, pp. 28-29), which could have resulted in humiliation.

Third, Mohanna's testimony on emotional distress is bolstered by the testimony of several of his coworkers.[4] *Turic*, 85 F.3d at 1215 (recognizing that the testimony of other witnesses as to their observations of one's conduct, although subjective, can bolster a finding of emotional distress). One of his coworkers stated that after comments were made to Mohanna about being Muslim on his first day of work, Mohanna appeared to not appreciate the comments and shook his head in disgust. (Doc. 35, Ex. D ¶ 16). His coworkers also observed that Mohanna often got upset and

---

[4] Although Jake Sweeney argues that Mohanna should not be permitted to rely on the declarations of his co-workers submitted in conjunction with his opposition to Jake Sweeney's Motion for Summary Judgment because they are "unsworn" (*see* Doc. 39, pp. 6, 15), that argument is not well taken. Federal Rule of Civil Procedure 56 permits reliance on declarations in opposing a motion for summary judgment. Declarations may be submitted in lieu of sworn affidavits when there is a statement that they are made under penalty of perjury, as permitted by 28 U.S.C. § 1746. Indeed, the cases relied upon by Jake Sweeney (Doc. 39, pp. 6, 15) are in accord, and the quote upon which Jake Sweeney relies from those cases is taken out of context. As all of the declarations submitted by Mohanna are made under penalty of perjury in accordance with 28 U.S.C. § 1746, it is proper for the Court to consider those declarations in rendering this opinion and order.

distressed by the regular comments and conduct of his co-workers directed towards Mohanna's race, religion or national origin. (Doc. 35, Ex. B ¶¶ 7, 11, 15-16, Ex. C ¶ 9, and Ex. D ¶ 21).

In light of the above evidence, the Court concludes that Mohanna has raised genuine issues of material fact as to his compensatory damages for emotional distress. His claim for emotional distress damages therefore survives summary judgment. As such, Jake Sweeney's argument that Mohanna is not entitled to punitive damages and attorneys' fees because he is unable to demonstrate any compensatory damages (Doc. 26 at 34; Doc. 39 at 16) is moot. Accordingly, the Court denies summary judgment to Jake Sweeney on the Title VII and Ohio claims for hostile work environment.

**B.      Disparate Treatment**

Mohanna claims that Jake Sweeney subjected him to disparate treatment in violation of Title VII and Ohio law. (Doc. 13, pp. 12-13, 15-16). To succeed on a claim for disparate treatment, Mohanna must produce either direct evidence or circumstantial evidence of discrimination. *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006) (citing *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004)); *Holbrook v. LexisNexis*, 862 N.E.2d 892, 896 (Ohio App. 2006). Here, Mohanna does not refute Jake Sweeney's contention that there is no direct evidence of discrimination. (Doc. 26, p. 13; Doc. 35, pp. 1-35). Instead, the parties argue over indirect, circumstantial evidence of discrimination. (Doc. 26, pp. 15-27; Doc. 35, pp. 17-35). Accordingly, Mohanna's disparate treatment claim is analyzed under the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as subsequently modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391

(6th Cir. 2008).

Under the *McDonnell Douglas* framework, Mohanna "bears the initial 'not onerous' burden of establishing a *prima facie* case of discrimination." *White*, 533 F.3d at 391 (quoting *Burdine*, 450 U.S. at 253). To demonstrate a *prima facie* case of discrimination, Mohanna must show that: (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *Id.* If Mohanna can establish a *prima facie* case, then "the burden shifts to the defendant [here, Jake Sweeney] 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 441 U.S. at 802). Finally, if Jake Sweeney articulates such a reason, the burden shifts back to Mohanna to present evidence that the non-discriminatory reason offered by Jake Sweeney was merely a pretext for discrimination. *Id.*; *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007).

"On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000). "Although the burdens of production shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007) (quoting *Burdine*, 450 U.S. at 253), *cert denied*, 552 U.S. 826, 128 S. Ct. 201 (2007)).

Here, the parties dispute three issues with respect to disparate treatment: (1)

whether Mohanna has raised a genuine issue of material fact as to the third factor of the *prima facie* case (Doc. 26, p. 15; Doc. 35, p. 23), that is, whether he suffered an adverse employment action,[5] (2) whether Mohanna has raised a genuine issue of material fact as to pretext (Doc. 26, pp. 15-18; Doc. 35, p. 23), and (3) whether Mohanna has proven damages. (Doc. 26, pp. 12, 28-35; Doc. 35, pp. 30-34). For the reasons explained below, the Court denies summary judgment to Jake Sweeny on the Title VII and Ohio claims for disparate treatment.

### 1.    Adverse employment action

The only adverse employment action at issue here is a constructive discharge based on a hostile work environment. (Doc. 26, pp. 15-18; Doc. 35, pp. 23, 25).[6] A constructive discharge may constitute an adverse employment action under Title VII. *Pa. State Police v. Suders*, 542 U.S. 129, 143 (2004) ("We agree with the lower courts and the EEOC that Title VII encompasses employer liability for a constructive discharge."). To prove constructive discharge based on a hostile work environment, the plaintiff must make an evidentiary showing beyond a normal hostile work environment. *Pa. State Police*, 542 U.S. at 133. The heightened standard for constructive discharge requires "[b]oth the employer's intent and the employee's objective feelings [to] be examined." *Logan v. Denny's, Inc.,* 259 F.3d 558, 569 (6th Cir. 2001) (citing *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999)). That means the plaintiff must

---

[5] Mohanna also argues that he has satisfied the fourth factor of his *prima facie* case because he was treated differently than other similarly situated employees. (Doc. 35, pp. 23-24). Since Jake Sweeney did not argue that factor as a basis for dismissing Mohanna's disparate treatment claim, the Court will not address that issue here.

[6] The parties are in agreement that Mohanna was not actually terminated by Jake Sweeney. (Doc. 26, p. 16; Doc. 35, p. 26). Further, Mohanna does not dispute that Mohanna's promotion to internet sales, Manager Wilson's request that Mohanna shave his beard or the refusal to lend Mohanna a company car individually do not constitute adverse employment actions, but he instead argues that those incidents should be considered cumulatively with other comments and conduct of Jake Sweeney employees and managers when determining whether Mohanna has raised a genuine issue of material fact as to the adverse employment action factor of his *prima facie* case. (Doc. 35, pp. 23-24).

adduce evidence that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and (2) the employer did so with the intention of forcing the employee to quit. *Logan*, 259 F.3d at 568-69 (citations omitted). In evaluating those two prongs, the Court must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 635 (6th Cir. 2003), *cert. denied*, 540 U.S. 1106, 124 S. Ct. 1052 (2004) (internal quotations omitted).

As explained below, the Court finds that Mohanna has raised a genuine issue of material fact as to whether he was constructively discharged from Jake Sweeney. Therefore, summary judgment to Jake Sweeney is denied on the adverse employment action factor of the *prima facie* case.

### a)     Prong one

Mohanna contends that he has raised a genuine issue of material fact as to the first prong of the constructive discharge inquiry by adducing evidence of numerous intolerant comments and actions of his co-workers and managers over a two-year period as well as evidence of his managers' failure to meaningfully respond to his complaints about the same. (Doc. 35, pp. 25-30). The Court agrees.

As an initial matter, Jake Sweeney's contention that Mohanna cannot satisfy the constructive discharge standard because he did not actually resign is not well-taken at the summary judgment stage. Although Jake Sweeney is correct that Mohanna must show he actually resigned in order to satisfy the constructive discharge standard, *Moore*, 171 F.3d at 1080, the Court finds that the facts construed in favor of Mohanna

raise a genuine issue of material fact on the issue.  The parties agree that Mohanna is no longer employed at Jake Sweeney.  (Doc. 28, p. 88; Doc. 35, p. 26).  Both parties also agree that Mohanna was not actually terminated by Jake Sweeney.  (Doc. 26, p. 16; Doc. 35, p. 26).  The logical inference then is that Mohanna resigned or otherwise walked away from his employment at Jake Sweeney.  That inference is supported by the evidence.  For example, there is evidence that Mohanna began searching for a new job prior to leaving Jake Sweeney.  (Doc. 28, pp. 11, 27, 86-87).  Several days before starting a new job, he left his work shift at Jake Sweeney and thereafter never returned to work at Jake Sweeney.  (Doc. 28, pp. 11, 86-89).  Two of Jake Sweeney's managers recalled that Mohanna had resigned.  (Doc. 29, pp. 52-54; Doc. 30, p. 23).  Although Mohanna may have indicated he left because he was told to go home and thought he was terminated, he also testified that he was looking for a new job at the time because of the discrimination and harassment he was facing at Jake Sweeney.  (Doc. 28, p. 27). Moreover, the evidence suggests that Mohanna did not resign because of an isolated incident, but instead resigned after a prolonged period of intolerant and unwelcome comments and conduct directed at him by his co-workers and managers.  Construing those facts in favor of Mohanna, there is a genuine issue of material fact as to whether he resigned.

As for whether a reasonable person in his position would have felt compelled to resign, Mohanna testified to multiple instances of intolerant comments and conduct directed at him by his co-workers.  For example, he testified that he was regularly called names such as "pipe bomb," "Rashid," and "terrorist," among others.  (Doc. 28, pp. 66-67).  His testimony is supported by declarations from two co-workers at Jake Sweeney.

(Doc. 35, Exs. B, D). Mohanna's testimony and the declarations also indicate that Mohanna's national origin regularly was mocked by some of his co-workers who in the presence of Mohanna and customers referred to Middle Easterners and East Indians as "dirker dirkers," "jihadi," "towel heads," and "suicide bombers," and made comments such as "Arabs shit in the street and wipe their ass with their hands[,]" and "Sunis and Shi'ites were crazy." (Doc. 28, pp. 63-65; Doc. 35, Ex. D ¶¶ 16-17). Mohanna also was asked by one co-worker why he did not just collect his welfare check, saying "[i]sn't that what you jihadis are doing anyway?" (Doc. 28, p. 43). Moreover, while Mohanna was performing his religious rituals, some of his co-workers would remove his religious pieces, purposely interrupt his religious practices, and taunt him. (Doc. 28, p. 43).

Mohanna's testimony and the declarations further provide evidence that managers of Jake Sweeney participated in making such comments to Mohanna. Some evidence shows that Assistant Manager Stephens called Mohanna names such as "Taliban," "terrorist," "Osama," "suicide bomber," "Bin Laden" and "pipe bomb," and told him "to go back to [his] own country." (Doc. 28, p. 37; Doc. 35, Ex. B ¶ 12). Also attributed to Assistant Manager Stephens is a statement that he practiced his own religion by "hating" Mohanna. (Doc. 35, Ex. B ¶ 17). There also is testimony that Manager Sweeney, the owner's son who Mohanna believed was the General Manager, made similar comments to Mohanna. (Doc. 28, pp. 44, 46, 57). Further, Mohanna's testimony and his co-workers' declarations indicate that Manager Wilson told Mohanna on several occasions to shave his beard because it made him "look like a terrorist," and mentioned that the General Manager was "on his ass" about Mohanna looking like a "terrorist." (Doc. 28, pp. 53-54; Doc. 35 Ex. B ¶ 6, Ex. C ¶ 10, and Ex. D ¶ 21). That

same manager did not allow him to take time off for an Islamic holiday or for prayers, even though other employees were permitted time off from work for other reasons. (Doc. 28, pp. 134-35).

Mohanna testified that he complained to Manager Wilson on multiple occasions and to Manager Sweeney in accordance with the company's harassment policy, but did not receive any meaningful relief from the comments and conduct. (Doc. 28, pp. 41-45, 57-58). He further testified that Manager Wilson and Manager Sweeney not only did not attempt to resolve the problem but also continued to engage in the same conduct about which Mohanna complained. (Doc. 28, pp. 44, 46, 53-54, 57). Although the policy at Jake Sweeney states that an employee "should" report such conduct and comments to the General Manager if his manager is unavailable or it is inappropriate to report the comments and conduct to him, the policy does not mandate that the employee do so. (Doc. 26, Ex. 1, p. 10). The facts construed in favor of Mohanna demonstrate that he believed that he reported the conduct to the General Manager when he complained to Manager Sweeney. (Doc. 28, pp. 44-45, 57) Nevertheless, even if Mohanna failed to comply with the policy, there is sufficient evidence from which to infer that it was reasonable for Mohanna to believe that complaining to the General Manager would not provide him with any of the relief he was seeking.

When viewed in the light most favorable to Mohanna, the above evidence shows that he faced a barrage of offensive and intolerant comments on a regular basis for approximately two years. Considering the totality of the circumstances, a reasonable jury could conclude that the comments and conduct were harassing and humiliating, and that the lack of meaningful responses by other managers and the continuation of

the comments and conduct in the presence of those managers would make a reasonable person feel compelled to resign. As such, Mohanna has raised a genuine issue of material fact on the first prong of the constructive discharge inquiry.

### b) Prong two

The Court also is persuaded that the evidence discussed with respect to the first prong raises a genuine issue of material fact as to the second prong of the inquiry, that is, whether Jake Sweeney created these conditions with the intention of forcing Mohanna to resign. The above conduct, coupled with the fact that Manager Wilson sent him home and told him not to come back on at least two occasions, could lead a reasonable person standing in Mohanna's shoes to feel unwelcome and compelled to resign. *Moore*, 171 F.3d at 1080-81 (finding that the defendant's conduct that led to the increasing isolation of plaintiff after the plaintiff filed an EEOC complaint was sufficient evidence for a jury to conclude that the defendant intended for the plaintiff to resign; "Day after day, week after week of isolation . . . would lead him to believe that he was no longer wanted"). Construing the evidence in the light most favorable to Mohanna, the Court finds that there is a genuine issue of fact as to whether Jake Sweeney intended for Mohanna to resign. Accordingly, Mohanna has satisfied both prongs of the constructive discharge inquiry, and summary judgment to Jake Sweeney on the adverse employment action factor of the *prima facie* case is denied.

### 2. Pretext

To demonstrate pretext, Mohanna must produce sufficient evidence from which a jury may reasonably reject the employer's explanation. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). Mohanna cannot satisfy that burden by conclusory statements and subjective beliefs. *Mitchell v. Toledo Hosp.*, 964 F.2d

577, 584-85 (6th Cir. 1992).

In arguing that Mohanna has failed to demonstrate sufficient evidence of pretext, Jake Sweeney focuses on two isolated incidents: (1) when Manager Wilson sent Mohanna home from work; and (2) when Mohanna was transferred from the sales floor to internet sales. (Doc. 26, p. 24). Jake Sweeney contends that Mohanna has not shown pretext as to the first incident for three reasons: (1) he relies upon an unsubstantiated and self-serving claim that Mohanna believed the real reason he was sent home was because he refused to shave his beard, (2) there was only one negative comment made by the assistant manager in over two years relating to his beard that Jake Sweeney infers to have been made out of concern for customers and Mohanna's performance, and (3) Mohanna and Manager Wilson allegedly were friends. (Doc. 26, pp. 25-26). Jake Sweeney further argues that the same actor inference prevents a finding of pretext because Manager Wilson both hired and allegedly fired Mohanna. (Doc. 26, p. 27). As for the second incident, Jake Sweeney alleges that it promoted him to the position because it believed Mohanna could improve his sales and that Mohanna voluntarily accepted that new role. (Doc. 26, p. 24).

Mohanna counters that Jake Sweeney's argument misses the mark because the adverse action here is constructive discharge, not two isolated incidents of disparate treatment. (Doc. 35, pp. 23-24). Mohanna contends that Jake Sweeney has not articulated legitimate nondiscriminatory reasons for creating a hostile work environment that led to a constructive discharge, and that even if it had, the multiple intolerant remarks and conduct that led to the constructive discharge are sufficient to raise a genuine issue of material fact as to pretext. (Doc. 35, pp. 23-24).

The Court agrees with Mohanna. The relevant adverse action here is a constructive discharge. Evidence of "[d]iscriminatory statements made by individuals occupying managerial positions can be particularly probative of a discriminatory workplace culture." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009) (citing *Vincent v. Brewer Co.*, 514 F.3d 489, 498 (6th Cir. 2007); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998)). Further, "discriminatory remarks, even by a nondecisionmaker, can serve as probative evidence of pretext." *Risch*, 581 F.3d at 393 (*Ercegovich*, 154 F.3d at 356-57). The relevance of such discriminatory remarks has been explained as follows:

> "Although discriminatory statements by a nondecisionmaker, standing alone, generally do not support an inference of discrimination, the comments of a nondecisionmaker are not categorically excludable. Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff. While evidence of a discriminatory atmosphere may not be conclusive proof of discrimination against an individual plaintiff, such evidence does tend to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff."

*Id.* (quoting *Ercegovich*, 154 F.3d at 356 (internal quotation marks and citations omitted)). In evaluating the remarks, the Court must consider "'factors affecting the statement's probative value, such as the declarant's position in the [employer's] hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment action, as well as whether the statement buttresses other evidence of pretext." *Id.* (quoting *Ercegovich*, 154 F.3d at 357). However, "'evidence of a . . . discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment.'" *Id.* (quoting

*Ercegovich*, 154 F.3d at 356).

Construing the facts in favor of Mohanna, the statements made in this case evidence a discriminatory atmosphere in which both managers and co-workers of Mohanna made derogatory and intolerant remarks to Mohanna about being a Muslim and about his race and national origin. As explained above with respect to constructive discharge, the comments and conduct directed towards Mohanna were made regularly and in various contexts over the course of two years, including just prior to when Mohanna parted ways with Jake Sweeney.

Also relevant to the pretext analysis is evidence that managers at Jake Sweeney treated Mohanna differently than other employees during his employment. *Risch*, 581 F.3d at 394 (finding that a manager's "'consideration of an impermissible factor in one context may support the inference that the impermissible factor entered the decisionmaking process in another context.'") (quoting *Ercegovich*, 154 F.3d at 356). For example, Mohanna testified that Manager Wilson refused to allow him to take time off in 2007 or 2008 for an Islamic holiday, and that Manager Wilson and Assistant Manager Stephens would not permit him to take time off for prayers even though other employees were routinely permitted to take time off work for "whatever reason." (Doc. 28, pp. 81-82, 135-36). Mohanna further testified that in August 2008, he was removed from the sales floor by Manager Wilson because he thought Mohanna's "appearance, [his] beard, [and him] being basically Arab and Muslim scared customers." (Doc. 28, p. 129). Manager Wilson told him on multiple occasions to shave his beard because it made him "look like a terrorist," even though other employees were permitted to have facial hair more extreme than Mohanna's. (Doc. 28, pp. 54, 143-44; Doc. 35, Ex. B. ¶¶

6-7, Ex. D ¶ 21).  Although many of the above facts are based upon the testimony of Mohanna, it is not for the Court to decide at this stage of the proceedings whether that testimony is credible.  Therefore, construing the facts in favor of Mohanna, the Court finds the facts support an inference that an impermissible factor led to a constructive discharge.  As such, Mohanna has raised a genuine issue of material fact as to pretext, and summary judgment to Jake Sweeney on this issue is denied.[7]

### 3. <u>Damages</u>

As the Court found above with respect to hostile work environment, Mohanna has provided sufficient evidence of emotional distress damages (and in turn, of punitive damages and attorneys' fees) at this stage of the litigation to survive summary judgment.

For this reason and each of the reasons stated above, the Court denies summary judgment to Jake Sweeney on the Title VII and Ohio claims for disparate treatment.

### C. <u>Retaliatory Discharge</u>

Mohanna claims that Jake Sweeney violated Title VII and Ohio law by retaliating against him for complaining about discrimination and the hostile work environment. (Doc. 13, pp. 13, 16).  As the *McDonnell Douglas* framework that is applicable to Mohanna's disparate treatment claim also is applicable to retaliatory discharge claim, Mohanna must first make a *prima facie* case of retaliation by demonstrating:  (1) he

---

[7] Jake Sweeney's argument (Doc. 26, p. 27) that the Court should infer a non-discriminatory intent because Manager Wilson both hired and allegedly terminated Mohanna, *see Richmond v. Johnson*, No. 96-6329, 1997 U.S. App. LEXIS 36574, at *7 (6th Cir. Dec. 18, 1997), does not change the Court's conclusion. First, such an inference is not mandatory and may be weakened by other evidence, such as the evidence described above, *see Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573-74 (6th Cir. 2003) (en banc).  Second, Jake Sweeney's argument that Manager Wilson was the sole actor for the purposes of this analysis assumes that Mohanna was "terminated" by Manager Wilson.  As the parties are in agreement that Mohanna was not actually terminated, Jake Sweeney takes too narrow a view of the issue.  The adverse action at issue is a constructive discharge resulting from a hostile work environment; there was no single individual who terminated Mohanna.

engaged in protected activity; (2) Jake Sweeney knew that Mohanna had engaged in protected activity; (3) he was subjected to an adverse employment action; and (4) a causal link existed between the protected activity and the adverse action. *White*, 533 F.3d at 391; *Lockett v. Marsh USA, Inc.*, 354 Fed. App'x 984, 997 (6th Cir. 2009). If Mohanna can establish a *prima facie* case, then Jake Sweeney has the burden of articulating a legitimate, nondiscriminatory reason for the discharge. *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 441 U.S. at 802). Finally, if Jake Sweeney articulates such a reason, then the burden shifts back to Mohanna to present evidence that the non-discriminatory reason offered by Jake Sweeney was merely a pretext for discrimination. *Id.*; *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007).

The arguments made by the parties with respect to retaliation are virtually the same as the arguments made with respect to disparate treatment. (Doc. 26, p. 23; Doc. 35, pp. 25-28). Specifically, Jake Sweeney argues that Mohanna (1) did not suffer an adverse action; (2) has not demonstrated pretext; and (3) has not proven any damages. (Doc. 26, pp. 23-35). Mohanna's counterarguments mirror those made with respect to disparate treatment. (Doc. 35, pp. 23-25, 30-34). The Court finds here, as it did above, that Mohanna has raised genuine issues of material fact on all three of those issues, and denies summary judgment to Jake Sweeney on the Title VII and Ohio claims for retaliation.

### D.   Failure to Accommodate

Mohanna claims that Jake Sweeney violated Title VII and Ohio law by failing to accommodate Mohanna's religious beliefs by pressuring him to shave his beard, and by denying requests to take time off for Friday prayers and religious holiday. (Doc. 13, pp. 14, 17). To establish a *prima facie* case of religious discrimination based on a failure to

accommodate, Mohanna must establish three elements: (1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he informed his employer about the conflicts; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement. *Burdette v. Fed. Express Corp.*, 367 Fed. App'x 628, 633 (6th Cir. 2010). At this stage, the parties dispute whether there is a genuine issue of material fact as to the *prima facie* case and whether Mohanna can prove damages. (Doc. 26, p. 21; Doc. 35, pp. 29-30). .

Jake Sweeney alleges that Mohanna's refusal to shave his beard did not conflict with any "employment requirement" relating to facial hair, and that he was not disciplined or discharged for failing to shave his beard. (Doc. 26, p. 22). As for taking time off for prayer and religious holidays, Jake Sweeney contends that Mohanna never "failed to comply" with the conflicting employment requirement because he never took any time off, and that he was not disciplined or discharged for such a failure to comply. (Doc. 26, p. 22).

Mohanna's response focuses only on the "discipline" and "discharge" language of the third factor of the *prima facie* case. (Doc. 35, pp. 29-30). Specifically, he argues that his coworkers' conduct is illustrative of the religious intolerance he experienced and of the circumstances which led to his constructive discharge. (Doc. 35, pp. 29-30).

The Court finds that Mohanna has failed to demonstrate a genuine issue of material fact on his failure to accommodate claims. Even assuming that he satisfies the discipline or discharge requirement based on a constructive discharge, Mohanna has not established that the constructive discharge related to his failure to comply with an employment requirement. With respect to shaving his beard, Mohanna has not

demonstrated that his failure to do so was in violation of an employment requirement. *Burdette*, 367 Fed. App'x at 633 (recognizing that to state a claim for failure to accommodate, an employee must be disciplined or discharged for failing to comply with a conflicting employment requirement). Mohanna has presented no evidence that demonstrates any employment requirement at Jake Sweeney that required him to be free of facial hair. Indeed, he admits that Jake Sweeney permitted other employees to have facial hair. (Doc. 28, pp. 143-44). His allegation that Manager Wilson told him to shave his beard to improve his sales (Doc. 28, pp. 53-54) is alone insufficient to demonstrate that being free of facial hair was an employment requirement. While Manager Wilson's comment may have put pressure on him to shave his beard, there is no indication that his failure to do so violated any actual policies or requirements.

As for failing to accommodate his religious holidays and prayer times, Mohanna has presented no evidence to the Court demonstrating that he ever took off any time for prayer or religious holidays in conflict with Jake Sweeney's attendance policy. (*See* Doc. 28, pp. 135-38). He also has not set forth any evidence that he resigned from Jake Sweeney just prior to an expected absence for prayer time or a religious holiday that would have resulted in discipline or his termination. Absent such evidence, he cannot state a claim for failure to accommodate. *See Burdette*, 367 Fed. App'x at 633; *Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007).

For the above reasons, the Court finds that Mohanna has not raised a genuine issue of material fact on every element of his failure to accommodate claims under Title VII and Ohio law. Accordingly, the Court grants summary judgment to Jake Sweeney on those claims.

**VI.    CONCLUSION**

Based on the foregoing, Jake Sweeney's Motion for Summary Judgment (Doc. 26) is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, it is ORDERED that:

1.    Summary judgment is GRANTED to Jake Sweeney on Mohanna's damage claim for lost commissions and lost wages, and that damage claim is hereby DISMISSED WITH PREJUDICE;

2.    Summary judgment is GRANTED to Jake Sweeney on Mohanna's claim for failure to accommodate under Title VII, and that claim is hereby DISMISSED WITH PREJUDICE;

3.    Summary judgment is GRANTED to Jake Sweeney on Mohanna's claim for failure to accommodate under Ohio law, and that claim is hereby DISMISSED WITH PREJUDICE; and

4.    Summary judgment is DENIED to Jake Sweeney on the remainder of Mohanna's claims for relief, and this case shall proceed to a jury trial on each of those claims.

Further, in accordance with Local Rule 7.1, the Court finds that an oral hearing on the Motion for Summary Judgment is unnecessary.  Accordingly, Jake Sweeney's Motion for Oral Hearing on Motion for Summary Judgment (Doc. 32) is hereby **DENIED.**

**IT IS SO ORDERED.**

s/ Michael R. Barrett
Michael R. Barrett, Judge
United States District Court